DIAMOND PARKING, INC., *Appellant,* v. FRONTIER BUILDING
LIMITED PARTNERSHIP, ET AL, *Respondents.*

R. Bruce Johnston, James B. Stoetzer, Michael B. King, and *Lane Powell Spears Lubersky,* for appellant.

*Philip R. Shucklin* and *Anderson Shucklin & Ellis; Stephen J. Sirianni* and *Sirianni & Youtz,* for respondents.

FORREST, J. — Diamond Parking, Inc. (Diamond) appeals the trial court's order granting Frontier Building Limited Partnership's summary judgment motion, contending that (1) the amendment to the original partnership agreement violated partnership law and the agreement's provisions and (2) material facts exist showing the general partners breached their fiduciary duty in proposing and gaining passage of the amendment.

In 1981, Diamond Parking, Inc., and six other parties signed a partnership agreement (Original Agreement) creating a real estate partnership, Frontier Building Limited Partnership (Frontier). Frontier's purpose was to acquire two adjoining properties in Anchorage, Alaska, and develop them as commercial office space in stages labeled phase I and phase II.

Diamond provided an initial $1.5 million capital contribution toward the $10 million total capital raised among the other limited partners. In addition, Diamond contributed over $50,000 of additional capital since 1981. Limited partners received a pro rata interest based on their contributions. Two general partners, John H. Resing (Resing) and Rainier Associates — Frontier Building (RAFB), were named in the agreement and received approximately a 25 percent interest in the partnership.

The Original Agreement vested the general partners with authority over the management, control of the business and affairs of the partnership. However, to make certain "major decisions", including amending the Original Agreement or admitting new general partners, the general partners had to obtain the prior written consent of the limited partners owning 70 percent of the total limited partner interest.

When the Anchorage real estate market became depressed in 1988, Frontier's expenses began to exceed its income. By

1989, Frontier's financial position had become tenuous and it needed to raise an additional $2 million capital over an 18-month period to avoid foreclosure and pay expenses.

Frontier's mortgage holder had granted previous concessions regarding the repayment schedule and refused to make additional concessions to address the current cash flow situation. In the spring and summer of 1989, after having investigated additional means of raising the needed funds, and realizing the limited partners were reluctant to make additional capital contributions, the general partners devised an amendment to restructure the partnership.

The proposed restructuring offered those limited partners willing to risk more capital a "substantial profit opportunity" and relabeled them class A limited partners. The amendment essentially divided the partnership interest into three groups: class B limited partners would retain a collective 5 percent interest, class A limited partners would receive an 85 percent interest, and general partners were entitled to a 10 percent interest. The 5 percent class B limited partner interest would be allocated in proportion to their percentage interest holdings under the Original Agreement. Class A limited partners received other benefits as well, including voting rights over major decisions, recovery of capital contributions, and allocation of losses. The amended agreement also replaced one of the general partners, RAFB, with TRF Pacific, Inc., a Washington corporation.

Four of the limited partners owning approximately 74 percent of partnership units voted in favor of the amendment. Diamond did not vote and refused to purchase class A units.

Diamond's interest was diluted from approximately 10 percent to 0.65 percent and its capital account was adjusted from $1.5 million to $56,250, receiving priority of repayment only for its post-1981 capital contributions.

Diamond filed suit in superior court alleging (1) the less than unanimous adoption of the 1989 amendment was wrongful and violated partnership law and/or the Original Agree-

ment, (2) general and limited partners acceding to the amendment breached their fiduciary duty owed to Diamond, and (3) the substitution of TRF Pacific for RAFB was wrongful and done solely to avoid the personal liability of RAFB's owners. As a remedy, Diamond sought an order declaring the amendment invalid and unenforceable as to it, an order declaring RAFB's owners personally liable notwithstanding TRF Pacific's position as a general partner, and attorney fees and expenses.

Frontier moved for summary judgment, which the Superior Court granted. The trial court based its dismissal of Diamond's claims on the grounds that (1) the changes effectuated by the restructuring agreement were within the scope of the terms of the Original Agreement, including paragraphs 4(c)(3), 6(c), and 12(f); and (2) the entire Original Agreement was adopted by unanimous consent. Diamond filed a motion for reconsideration claiming the trial court failed to address the breach of fiduciary duty issue, and contending the order meant "a majority can do anything it wants to do so long as proper procedures are followed." The motion for reconsideration was denied.

Diamond then sought direct review of the trial court decision by the Washington Supreme Court under RAP 4.2(a)(4). Finding no fundamental or urgent issue of broad public interest, the Supreme Court transferred the case to this court.

## ISSUES

1. Did passage of the amendment violate the Original Agreement or partnership law?

2. Does the restructuring of the partnership raise issues of material fact as to a breach of the general partners' fiduciary duty?

## DISCUSSION

At trial, Diamond's principal contention was that the partnership amendment was so grossly unfair that as a matter of law Diamond was entitled to relief. This contention is essentially abandoned on appeal and correctly so. A partnership

agreement is the law of the partnership.[1] Nothing in the amendment violates the partnership act. Concededly, the procedural requirements of the partnership agreement were followed. The 70 percent supermajority approved the amendment. Having elected to join the partnership with this type of majority voting provision, Diamond cannot now complain merely because the partnership adopted an amendment of which it did not approve. Like all the partners, it was presented with a business decision as to whether to invest more money in hopes of salvaging an investment that was in financial difficulty. Having elected not to make any further investment, it has no legal cause of complaint for the reduction of its interest in the partnership.[2]

On appeal Diamond's chief contention is that the general partners breached their fiduciary duty to the limited partners because they had a conflict of interest with regard to, and failed to make full disclosure of the material facts concerning, the proposed amendment and that therefore he is entitled to some form of relief. The two theories, those of conflict of interest and nondisclosure, can effectively be analyzed as one because Diamond's entire case is based on the fact that the amendment of the partnership agreement substantially reduced its interest in the partnership. Any conflict of interest or failure to disclose that did not affect the adoption of the amendment would be *damnum absque injuria*.

■ We agree that general partners owe limited partners a fiduciary duty described as *"the highest standard of conduct"*. *Obert v. Environmental Research & Dev. Corp.*, 112 Wn.2d 323, 337, 771 P.2d 340 (1989). "The main elements of

---

[1]"The agreement, whatever its form, is the heart of the partnership. One of the salient characteristics of partnership law is the extent to which partners may write their own ticket. Relations among them are governed by common law and statute, but almost invariably can be overridden by the parties themselves. As one court has long put it, the agreement is the law of the partnership." *Seattle-First Nat'l Bank v. Marshall*, 31 Wn. App. 339, 347, 641 P.2d 1194 (quoting A. Bromberg, *Partnership* § 5, at 43 (1968)), *review denied*, 97 Wn.2d 1023 (1982).

[2]After adoption of the amendment it was still urged to contribute and avoid the substantial reduction in its interest.

the partners' fiduciary duties are well recognized: utmost good faith, fairness, and loyalty." 2 A. Bromberg & L. Ribstein, *Partnership* § 6.07, at 6:68 (1992). However, general statements as to fiduciary duty are not very helpful on these facts.

Here, the unusual and dispositive fact is that the direct cause of any damage to Diamond flowed from the votes of its fellow limited partners and not from the general partners' unilateral actions.[3] In light of this fact, Diamond's theory that it was damaged by any breach of the general partners' fiduciary duty is peculiar indeed. Diamond cannot claim that it was in any way misled because it abstained from voting altogether, which was the equivalent of voting against. So its claim is reduced to assertions that a more complete disclosure, including the alleged conflict of interest, would have led enough of the other limited partners to oppose the amendment to defeat it. The fatal flaw with this theory is that there is not a shred of evidence to support it.

Indeed, the other limited partners' choice to join Frontier in defending against this lawsuit convincingly refutes such a claim. Even Steve Suskin, a limited partner, who, like Diamond, did not choose to participate in making the additional investment, does not claim he was misled by any failure to disclose. On the contrary, he unequivocally states that the amendment was the best course of action for the partnership. Significantly, Diamond made no effort by deposition, or even by a hypothetical question to an expert, to show that any partner was uninformed or would have voted differently in light of the arguments now made. Speculation does not generate factual issues.

Accordingly, even assuming arguendo that the general partners failed to disclose some material information, no reasonable inference exists to go to the trier of fact that the limited partners would have acted differently had all the missing information been presented to them. Although this

---

[3]Logically, although unpersuasively, Diamond in the trial court did seek to hold the other limited partners liable for his claimed damage.

is dispositive, we will briefly address Diamond's other contentions.

■ Diamond also argues that, because there was a conflict of interest, the general partners must prove that the transaction, in this case the amendment, was fair. It was only the limited partners who could adopt the amendment. The fairness of the amendment was for the limited partners to decide. We do not accept Diamond's contention that the limited partners had passive roles in approving the restructure. These were sophisticated investors confronted with a proposed solution for a failing partnership. What the general partners need to show is that they did not fail to disclose material information relevant to the decision. For the purposes of this issue we adopt the definition offered by Diamond; a material nondisclosed fact is one that "might be expected to have induced action or forbearance by the other partners . . .". 2 A. Bromberg & L. Ribstein, *Partnership* § 6.06, at 6:64 (1992).

What is material depends on the specific context and the knowledge and information of the respective parties.[4] One would not need to point out to a CPA that an investment in treasury obligations would be taxable for federal income tax purposes while an investment of municipal bonds would not. In short, full disclosure does not include telling people what they already know.

Diamond's principal claim of nondisclosure, emphasized by a handout at oral argument, is that the general partners would remain liable in the event that the limited partner-

---

[4]"The extent of the duty to disclose depends on the circumstances of the individual case, consistent with the policy that the duty should depend on the parties' relative costs of obtaining the information. The duty may depend on the degree to which the parties have access to accurate financial records . . . on whether the nondisclosing partner managed the business and thus was familiar with the relevant information, and *on the knowledgeability or degree of expertise of the party to whom the duty of disclosure is owed*." (Footnote omitted. Italics ours.) 2 A. Bromberg & L. Ribstein, *Partnership* § 6.06, at 6:64 (1992); *see also Midland Nat'l Bank v. Perranoski*, 299 N.W.2d 404, 413 (Minn. 1980) ("A fiduciary's duty must be defined with reference to the experience and intelligence of the person to whom the duty is owed.").

ship filed bankruptcy. While not dispositive, it is important to note that legal rules of bankruptcy, rather than facts, are what were allegedly not disclosed. Here, we have sophisticated investors making a substantial investment with ready access to their own legal and accounting advice, together with the benefit of an attorney provided by the partnership, to analyze this transaction. It is almost ludicrous to argue that these sophisticated investors did not know this legal rule.

Diamond makes no effort to show that the limited partners were unaware of the legal implications of bankruptcy so far as the liability of the general partners is concerned. The partnership had been in financial difficulties for some time. In fact, the prior year other limited partners had made additional contributions, although Diamond refused to do so. Bankruptcy was discussed as a possible alternative. None of the limited partners, including Diamond, sought any further information as to the effect that a bankruptcy filing would have on the liability of the general partners. Just a week after the adoption of the amendment, Diamond wrote urging that bankruptcy was the best way to go for the limited partners and was necessary to avoid immediate action by the mortgage company. It had ample opportunity to urge its views, including all its present arguments, on the limited partners prior to the vote on the amendment if it believed, as it now argues, that it was unaware of these elementary facts.[5]

At oral argument Diamond's theory seemed to be that placing the limited partnership in bankruptcy, or threatening to do so, would force the general partners to find sufficient funds to tide the partnership over in order to protect themselves from individual liability. Yet, the general partners were no more legally required to advance funds than were the limited

---

[5]The "J.D. Memo", to which Diamond alludes repeatedly, contains, at best, a cursory appraisal of the effect of bankruptcy on the limited and general partners. Diamond offers no context, despite ample discovery time, to show how this memo might reveal material information which was unavailable to the limited partners or would influence their decision.

partners. There is not even a showing that the general partners had the resources to make the needed advance, let alone that they were willing to do so. Nor did Diamond show that the general partners would have been unable to secure protection while the partnership was in bankruptcy.[6] Beyond that, it is pure speculation on this record that placing the partnership in bankruptcy would have been in the best interest of the partnership.

Diamond offered no testimony setting forth any reasonable scenario of how bankruptcy would be advantageous or any other plausible alternative. There was no proof that the building could be refinanced, without which it would have been lost to the mortgagee with adverse tax consequences to the limited partners. Counsel's speculation is no substitute for evidence. In the context of a history of financial difficulty, with considerable discussion of bankruptcy as an alternative and with a small number of sophisticated investors, no reasonable trier of the fact could find that failure to include a summary of the applicable bankruptcy act provisions was failure to disclose a material fact.

Diamond complains of the benefits accruing to the general partners from the amendment. A conflict of interest will always exist when there is a change in the respective interests of the general and limited partners in the partnership. These conflicts are fully disclosed by the terms of the amendment.[7]

■ Diamond also contends that the managing partner in a limited partnership, when there is an adjustment in the interest of the limited partners, should be held to the same standards as those applicable under the security code, RCW 21.20.010. Neither statutory nor case authority is cited mak-

---

[6]11 U.S.C. §§ 105 (1988), 362 (1988 & Supp. IV 1992).

[7]The amendment specifically indemnified the general partners from suits arising from the amendment's passage and revealed the details of the general partners' changed position. Diamond cannot argue, based on these facts, that the limited partners did not understand the terms of the amendment, or its ramifications as to the general partners.

ing such a requirement. It is unclear what, if anything, would be added to the already existing fiduciary duty owed by the general partners to the limited partners. We hold the state securities act inapplicable.[8]

Finally, Diamond asserts that there is an issue of fact as to whether the amendment was a dissolution of the partnership. However, no disputed fact is identified. No case is cited treating any similar amendment to a partnership agreement as constituting a dissolution of the partnership. Factually, the partnership continued as a business, the only change being in the respective interests of the general and limited partners. Not having sought dissolution and an accounting in the trial court, it is too late for Diamond to raise the issue now.

Accordingly, we affirm the trial court's grant of summary judgment, finding that no genuine issues of fact exist as to Diamond's various claims.

GROSSE and AGID, JJ., concur.

Reconsideration denied February 9, 1994.

Review denied at 124 Wn.2d 1028 (1994).

[No. 30746-1-I.   Division One.   December 30, 1993.]

---

[8]Additionally, in the context of Diamond's argument to expand the measure for judging the breach of a general partner's fiduciary duty, we find that the requirement for an independent opinion as to the fairness of a particular partnership transaction is not supported by authority.